FREDERICK R. PRIEST, Appellant, *v.* CHARLES P. CHOUTEAU, Respondent.

### May 23, 1882.

1. A contract creates a partnership when it provides for a sharing of profits and losses in a business, and imposes the duty of accounting between the parties.

2. A theatre building and its appurtenances owned by partners are partnership property where the partnership business consists in the uses to be made thereof.

3. The title acquired under a sale by a surviving partner, as administrator, is superior to that acquired at a prior foreclosure sale, under a deed of trust executed by one of the partners upon his interest in the property.

4. Where the establishment of a contract does not oppose any interest of the estate of one of the parties thereto who has since died, the other party is a competent witness.

APPEAL from the St. Louis Circuit Court, THAYER, J.
*Affirmed.*

A. J. P. GARESCHÉ, for the appellant: An agreement for a division of profits does not constitute a partnership. — *McCauley* v. *Able*, 21 Mo. 439; *Gwinn* v. *Rooker*, 24 Mo. 292; *Campbell* v. *Dent*, 54 Mo. 325. The property, though bought for the partnership, was held by the partners as tenants in common.—*McDermott* v. *Lawrence*, 7 Serg. & R. 442; *Frink* v. *Branch*, 16 Conn. 270; *Webb* v. *Leggitt*, 6 Mo. App. 347; *Coles* v. *Coles*, 15 Johns. 160. And where, as in this case, the conveyances are to individual members, the property cannot by parol be converted into partnership property. — *Lancaster* v. *Higley*, 13 Pa. St. — ; *Ridgway's Appeal*, 15 Pa. St. 181; *Otis* v. *Sill*, 8 Barb. 122; *Bird* v. *Morrisson*, 12 Wis. 155.

HERMANN & ROBERTSON, for the respondent: Where persons agree to share profits and are silent as to losses, they become partners. —*Long* v. *Smith*, 48 Mo. 277; *Meyers* v. *Field*, 37 Mo. 440; *Maclay* v. *Freeman*, 48 Mo. 234. A further test is a right to an accounting. — *Pleasant* v. *Fant*, 22 Wall. 120. The leasehold in controversy was partner-

ship property. — *Clagett* v. *Kilbourne*, 1 Black, 346. And could not be used by one partner in payment of his individual debt. — *Dupont* v. *McLaren*, 61 Mo. 508; *Acley* v. *Stahlien*, 56 Mo. 560.

LEWIS, P. J., delivered the opinion of the court.

On May 13, 1873, Benedict DeBar acquired by purchase, from Truman Martin and wife, an existing leasehold of the Grand Opera House, in St. Louis, which was to expire on January 1, 1882. Ten days afterwards, he entered into an agreement with Mrs. Alice L. Wakefield's trustee, in the following terms:—

"This memoranda of agreement, made and entered into this twenty-third day of May, A. D. 1873, by and between Benedict DeBar and Daniel G. Taylor, trustee for Mrs. Alice L. Wakefield, witnesseth: That in consideration of $3,333.33 in cash paid, and the payment of the additional sum of $10,000, for which a promissory note has this day been given, it is agreed by Ben DeBar that said Daniel G. Taylor, as such trustee, shall have one-third of all the profits derived from the Grand Opera House property on Market Street, the same to be managed and controlled by said Ben DeBar as exclusively as though owned by him, during the continuance of the leasehold estate purchased by said Ben DeBar from Truman Martin and wife; all profits to be accounted for by said Ben DeBar on the first day of each month; and the one-third of the profits of the previous month, less twenty-five per cent, to be reserved to meet any losses that may occur, to be paid to said Taylor, as such trustee; such twenty-five per cent so reserved to be carried to the account of the next month following; and when the said note of $10,000 is paid according to the tenor thereof, then a one-third of the building and property mentioned and referred to shall be by deed conveyed to said Daniel G. Taylor, as such trustee; but the management of said premises shall continue in like manner as herein set

forth, and in the event that said note for $10,000 is not paid when due, the title to said property to fully remain in said DeBar, released from all claim and interest of said Taylor, as such trustee, and until the payment of said note the profits to be retained by said DeBar to be applied upon said note; and in the event of a failure to pay said note when due, one-half of the $3,333.33⅓ this day paid shall be repaid to said Taylor, as such trustee, and the balance shall be, with all interest of said Taylor as such trustee, hereunder forfeited to said Ben DeBar and forever terminated."

On December 13, 1873, DeBar and wife executed a deed conveying to the same trustee for Mrs. Wakefield, one-third part of the leasehold estate above described. This conveyance was expressed to be subject to the terms of the agreement of May 23rd, above copied. By deed dated December 15, 1873, DeBar and wife conveyed to the defendant in this suit, one-sixth part of the same leasehold. This deed contained the following proviso: —

"This conveyance, however, being subject to the terms and conditions of a certain contract made between the parties hereto on the twenty-third day of May, 1873, which contract is in its terms and provisions similar to a certain other contract of same date between Benedict DeBar and Daniel G. Taylor, trustee of Alice Wakefield."

On April 26, 1875, DeBar and wife executed a deed to Mrs. Wakefield's trustee, reciting the payment by her of the $10,000 note, and conveying absolutely the one-third part of the Grand Opera House, "with all its appurtenances, furniture, scenery, fixtures, properties, hereditaments, leaseholds, and effects whatsoever, thereto belonging." This conveyance repeated the stipulations contained in the agreement of May 23, 1873, with regard to the control and management of the division of profits, with the reservations, etc.

On June 15, 1877, DeBar and wife executed a deed of

trust, conveying the one undivided half of the leasehold and its appurtenances, including the furniture, decorations, paraphernalia, etc., to secure John G. Priest, as accommodation indorser for DeBar on two promissory notes, one for $5,000, and the other for $1,000. About August 26, 1877, DeBar died, and, soon afterwards, John G. Priest became administrator of his individual estate.

On September 25, 1877, the defendant herein was appointed and qualified in the St. Louis Probate Court, as surviving partner of the alleged late partnership firm composed of DeBar, deceased, Mrs. Wakefield, by her trustee, and the defendant. On April 10, 1879, there was a sale in foreclosure under the deed of trust given by DeBar on June 15, 1877, when the plaintiff in this suit became the purchaser. On June 3, 1879, an order was made by the probate court directing the defendant, as surviving partner of the late firm, to sell, for payment of the debts of the partnership estate, the leasehold, and personal property belonging to said estate. Sale was made accordingly, in due course of law, as prescribed, on June 16, 1879, when John W. Norton became the purchaser of the property, and the defendant put him in possession. This is a suit in ejectment, for one undivided half of the leasehold. The circuit court, sitting as a jury, upon a hearing of the facts, gave judgment for the defendant.

It is conceded that if the business association of DeBar, Wakefield, and Chouteau constituted a partnership, and the leasehold in the Opera House was part of the partnership property, then the lien in behalf of creditors of the firm and the sale by the surviving partner to make this effectual, must prevail over the title acquired from the deed of trust given by DeBar, and the plaintiff cannot recover, unless the defendant is estopped from making such a defence.

It is insisted for the plaintiff that there was no partnership, but only a case of advances made by Wakefield and Chouteau to DeBar, to aid him in his business, for which they re-

ceived, as compensation, certain interests in the leasehold and in the profits of the business. It seems to be argued in this connection that, while there was a sharing of profits in certain proportions, there was no such community of losses as is essential to every partnership. As to everything except the amounts of their respective interests, the basis of association among the three parties was set out in the written agreement between DeBar and Mrs. Wakefield's trustee, of May 23, 1873. This instrument was referred to and re-adopted in the deeds subsequently made by DeBar to the same trustee, and its terms were virtually adopted in the deed from DeBar to Chouteau. Mr. Chouteau testified that his agreement with DeBar was oral only, but that, except in the extent of interest, there was no difference between his co-partnership relation and that of Mrs. Wakefield, through her trustee. It was part of these agreements that twenty-five per cent of the share of profits falling to either party should be reserved monthly, " to meet any losses that may occur." This clearly shows the intention of the parties that losses were to be shared, as well as profits. In addition to this, it is a generally accepted rule, that a community of profits implies a community of losses, and this seems to follow naturally from the consideration that losses are, in a certain sense, nothing more than a diminution of profits. *Lengle* v. *Smith*, 48 Mo. 276 ; *Whitehill* v. *Shickle*, 43 Mo. 543 ; *Meyers* v. *Field*, 37 Mo. 440. But the plaintiff contends that a verbal understanding between DeBar and Chouteau, whereby Chouteau was to be protected against any losses to an extent exceeding the twenty-five per cent reserve, divested the whole arrangement of any partnership character. In *Whitehill* v. *Shickle* (43 Mo. 537), it was agreed by the several parties in a joint enterprise that, for the first four months' business, the plaintiff should not be liable for any losses. It was held that during this period, there was no partnership as to him. But in that case, the exemption from liability was a feature of the same agreement that was

relied on to prove the partnership. It was joined in by all the parties, and all were bound by it. In the present case, Mrs. Wakefield and her trustee had nothing to do with the special understanding, and were not bound by it. It was no part of the common basis of association which, as already shown, was defined in the instrument of May 23, 1873. If it had any force at all, it was only as a private personal guaranty by DeBar, outside of the terms of the triple association, and having no effect upon the stipulations whereby all were bound. It may be objected that no agreement was ever made by the three parties, as a joint and concurrent act. But such would not be a true statement of the case. DeBar and Mrs. Wakefield first entered into a co-partnership. Afterwards, DeBar sold to Chouteau a part of his interest, thus introducing a new partner, who was expressly bound by the stipulations and conditions of the first agreement. Two compacts that severally agree with a third, agree with each other. Mrs. Wakefield, by her silence and co-operation, consented to the accession of the new partner, and thus consummated the triple agreement. It must be observed, however, that a partnership is not necessarily created by an expressed agreement between the parties that they will be partners, but may arise from the establishment of such relations between or among them as will create, in law, the duties, responsibilities, and consequences of a partnership. *Meyers* v. *Field, supra.* This is a sufficient answer to all the arguments for the plaintiff, derived from certain acts or omissions of the several parties, about the affairs of the Opera House. These omissions might tend to show that the parties did not consider themselves partners. But the question to be determined is not one of personal views or opinions. It looks only to the consequences which the law attaches to the character and terms of the business relations which the parties have practically adopted among themselves.

We think there can be no serious question that the

business arrangement under consideration constituted a partnership, in law. If Mrs. Wakefield and Chouteau had contemplated nothing more than a compensatory return for their advances, in the shape of a share in the prospective profits of the theatre, all this would have been quite as fully accomplished without any acquisition of an interest in the property. Not a dollar was added to their shares in the profits, by the conveyances to them of interests in the lease-hold. The only practical effect was to insure their contribution to the debts or losses of the business for which the leasehold property might be held responsible. But these conveyances added to the community of interest in profits, a community of interest in the property, also, by whose means the profits were to be brought into the common fund. Other ways were open, as plaintiff's counsel suggests, for reaching the same end. But this does not prove that the method adopted was not as good as any. This community of interest in the property must be added to other numerous *indicia* of a partnership relation, in this case, which defendant's counsel have collated in their brief. Besides, there was the right to an accounting, which was secured in the original agreement and perpetuated in those that followed. This right has always been regarded as one of the most approved criteria of the existence of a partnership. *Pleasants* v. *Fand*, 22 Wall. 120. While it is true that mere personal opinions of the parties can neither affirm nor repudiate the existence of a partnership, against satisfactory proofs of the contrary, yet such opinions and understandings may go very far to corroborate and confirm the conclusion already reached by other means. To this end we may here apply the facts following: A firm name, "the Grand Opera House," seems to have been adopted, in which a bank account was kept separate from that of DeBar himself, and in which bills were contracted for, and notes were made and discounted. The right of direction and management of the business and affairs of the theatre, was

not left in the hands of DeBar as a proprietary right independent of, and ante-dating, the association, and continuing thereafter by its own force, but was made matter of a special agreement among all the parties, who thus recognized this controlling authority as of common right among them, which all were entitled to confer upon one of their number. Such, at least, is the legal effect of the reservations in the contracts. Some months before the death of DeBar, he became involved in financial difficulties, and the business of the theatre was not at the time self-sustaining. Upon his request, Mrs. Wakefield, through her trustee and Mr. Chouteau, gave DeBar an express authority '' to use the income of the concern and pledge its credit to carry it on.'' Plaintiff's counsel suggests that, if a partnership ever existed, it began with that transaction, which in itself shows that none had existed before. We draw a different conclusion from the same premises. The power to confer such an authority must have ante-dated the act itself. The doing of the act did not show that there existed no partnership which might do it, but rather that, by the terms of the partnership, as understood, one partner could not exercise the power conferred, without the consent of his fellows. The question whether the leasehold of the Opera House was partnership property, requires no discussion when it is once settled that a partnership existed. All the vitality, the soul, so to speak, of the business association, by whatsoever name it may be called, was visible nowhere but in the uses to be made of the building and its appurtenances. As well question whether the goods bought and sold by a mercantile firm may be considered partnership property while in stock.

It is argued for the plaintiff, that the defendant cannot set up the claims of the partnership against the sale deed of trust, because that instrument was executed under an authority from all the partners to pledge the credit of the concern, and because the money thus obtained was used for

the common benefit. It is not at all clear that these propositions of fact are true. It is certain that DeBar did not, in that deed, "pledge the credit of the concern," for he conveyed, or attempted to convey, nothing but his own interest. The testimony showed that the money was deposited for the private bank-account of DeBar, and not for that of the Grand Opera House. There was testimony tending to show that much of it was afterwards checked out for purposes connected with the theatre. But the most that can be said of this is that, DeBar thus made some voluntary advances for the benefit of the concern. An insuperable difficulty in the way of the plaintiff's claim, however, lies in the fact that the sale by the surviving partner was for the benefit, not merely of the partners, but chiefly for that of the creditors of the partnership estate. Surely these could not be deprived of their rights in the partnership assets, by any such considerations as are presented in this connection.

Some objections were saved on admissions and refusals of testimony. But, in view of the undisputed facts of the case, we find none that would warrant a reversal. The testimony of Mr. Chouteau was clearly admissible under the ruling in *Looker* v. *Davis* (47 Mo. 140), and other cases which have followed it. We find no error in the conclusion reached by the circuit court, and its judgment is affirmed. All the judges concur.

LEWIS, P. J., delivered the opinion of the court on a motion for a rehearing.

There is a very clear distinction between this case and *Hughes* v. *Israel* (73 Mo. 538), to which our attention is called in the motion for a rehearing. There, a contract between the defendant and his deceased son was set up to defeat the title of the plaintiff, held under the son. The inability of the son to testify in support of his transmitted title gave to the defendant the "undue and unfair advantage" which Judge Wagner, in *Looker* v. *Davis* (47 Mo.

140), says the statute was designed to avoid. The testimony of Chouteau, in this case, did not impugn the deed under which the plaintiff claims, or DeBar's capacity to make it. The contract of partnership, which the testimony tended to prove, left DeBar free to convey his individual interest as he might choose, and no interest of DeBar's estate was opposed to the establishment of the contract. But, even if it be admitted that the testimony ought to have been excluded, this will furnish no ground for a rehearing, or for a reversal of the judgment. The deed from DeBar to Chouteau, of December 15, 1873, with its references to the terms of a previous contract, and to those of the contract between De-Bar and Mrs. Wakefield's trustee, was sufficient, for all the purposes accomplished by Chouteau's testimony, in satisfying the court of the existence of a partnership. There is no propriety in reversing a judgment for the admission of testimony which has worked no prejudice to the party objecting.

As to the other points presented in this motion, they simply prolong the discussion of matters already considered and disposed of, while their effect is nothing more than a criticism of the opinion. They do not, therefore, fall within the rule which defines the proper grounds of a motion for rehearing. The motion is overruled. All the judges concur.